No. 22-13893

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

VERA COOPER, et al.,

Plaintiffs-Appellants,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Northern District of Florida

———————————

**SUPPLEMENTAL BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JASON R. COODY
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for defendants-appellees

certify that the Certificate of Interested Persons and Corporate Disclosure Statement

contained in plaintiffs-appellants' reply brief is complete and correct.

*s/ Steven H. Hazel*
Steven H. Hazel

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ............................................................................. 1

ARGUMENT ........................................................................................................... 3

    A.    *Rahimi* Clarifies the Analytical Framework Governing Second Amendment Challenges .................................................................. 3

    B.    The Analytical Framework Articulated in *Rahimi* Confirms the Constitutionality of Section 922(g)(3) ........................................................ 6

CONCLUSION ......................................................................................................... 15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................ 4, 6, 14

*Harmelin v. Michigan*,
    501 U.S. 957 (1991) ................................................................ 9, 10

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ....................................................... 7

*Muscarello v. United States*,
    524 U.S. 125 (1998) ................................................................... 7

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ................................................................5, 10, 14

*Rogers, In re*,
    66 P.2d 1237 (Cal. Dist. Ct. App. 1937) ....................................... 8

*Rosemond v. United States*,
    572 U.S. 65 (2014) .................................................................... 7

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) .............................................................. 10

*United States v. Daniels*,
    No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) ..................... 2

*United States v. Dubois*,
    94 F.4th 1284 (11th Cir. 2024) .................................................. 10

*United States v. Edmonds*,
    348 F.3d 950 (11th Cir. 2003) ................................................ 8, 10

*United States v. Rahimi*,
    No. 22-915, 2024 WL 3074728 (June 21, 2024) ... 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13, 14

*United States v. Yancey*,
    621 F.3d 681 (7th Cir. 2010) ..................................................... 11

**Statutes:**

47 Stat. 652, § 7 (1932) ................................................................. 8

18 U.S.C. § 922(g)(3) ................................................................. 1, 9

18 U.S.C. § 922(g)(8) ................................................................. 1, 5, 6

21 U.S.C. § 812(c), sched. I-II ................................................. 12

21 U.S.C. § 812(c), sched. I(c)(10) ........................................... 9

21 U.S.C. § 844 ........................................................................... 9

Mo. Rev. Stat. § 1274 (1879) .................................................... 7

**Legislative Materials:**

Act XII of 1655, 1655 Va. Laws 401, 401-02 ............................ 7

An Act for preventing Mischief being done in the town of Newport,
    or in any other Town in this Government,
    1731 R.I. Sess. Laws, pp. 240-41 ....................................... 7

1936 Ala. Laws 52, no. 82, § 8 ................................................... 8

1909 Id. Sess. Laws 6, no. 62, § 1 ............................................. 7

Kan. Sess. Laws 25, § 282 (1867)............................................. 7

1878 Miss. Laws 175-76, § 2 ..................................................... 7

Ch. 1501, 5 Colonial Laws of New York 244-46 (1894) ............. 7

1890 Okla. Sess. Laws 495, art. 47, § 4 .................................... 7

1931 Pa. Laws 499, no. 158, § 8 ................................................ 8

1844 R.I. Pub. Laws 503-16, § 1 ............................................... 7

1899 S.C. Acts 97, No. 67, § 1 ................................................... 7

1935 S.D. Sess. Laws 356, ch. 208, § 8 .................................... 8

1935 Wash. Sess. Laws 601, ch. 172, § 8 ................................. 8

1883 Wis. Sess. Laws 290,
Offenses Against Lives and Persons of Individuals, ch. 329, § 3 ............................ 7

**Other Authorities:**

Bureau of Justice Statistics, U.S. Dep't of Justice,
*Drug & Crime Data—Fact Sheet: Drug Related Crime* (1994),
https://perma.cc/NWH7-PNY4 ................................................................ 10

Nat'l Acads. of Scis., Eng'g, & Med., *The Health Effects of Cannabis
and Cannabinoids: The Current State of Evidence and Recommendations
for Research* (2017) ................................................................ 9, 10

*Notice of Proposed Rulemaking: Schedules of Controlled Substances:
Rescheduling of Marijuana*, 89 Fed. Reg. 44,597 (May 21, 2024) .................................. 9

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) .............................. 6

## INTRODUCTION AND SUMMARY

The government respectfully submits this supplemental brief in response to the Court's February 14, 2024, order directing the parties to address the effect of the Supreme Court's decision in *United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024), on this case. In *Rahimi*, the Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8), the federal prohibition on the possession of firearms by individuals subject to certain domestic violence restraining orders. Although *Rahimi*'s holding is limited to the constitutionality of that prohibition, its reasoning supports the conclusion that 18 U.S.C. § 922(g)(3), which disarms "unlawful user[s]" of controlled substances, comports with the Second Amendment.

*Rahimi* rejected an unduly narrow approach to Second Amendment analysis. The Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Rahimi*, 2024 WL 3074728, at *6. Those cases, the Court observed, "were not meant to suggest a law trapped in amber." *Id.* Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* In applying that analysis to uphold the challenged firearms prohibition, the Court emphasized that although the prohibition "is by no means identical" to historical laws, "it does not need to be." *Id.* at *9. After issuing its decision in *Rahimi*, the Supreme Court vacated a Fifth Circuit decision concluding that Section 922(g)(3) violates the Second Amendment as applied to an unlawful user of marijuana and remanded for further

consideration in light of *Rahimi*. *See United States v. Daniels*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024).

History shows that legislatures hold authority to disarm categories of persons whose possession of firearms would endanger themselves or others. *Rahimi* itself recognized that "[s]ince the founding, our nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." 2024 WL 3074728, at *5. The limited restriction at issue here, which applies only to individuals engaged in the regular and ongoing use of illegal drugs, "fits comfortably" within that tradition and the principles underpinning it. *Id.* Armed drug users endanger the public in multiple ways. And Section 922(g)(3) bears at least as close a resemblance to historical laws as the modern prohibition that *Rahimi* had "no trouble" upholding. *Id.* at *10.

Plaintiffs' contrary argument is premised on the rigid historical approach that *Rahimi* rejected. Plaintiffs assert that because historical legislatures chose to prohibit the possession of firearms by individuals who were currently intoxicated or who were addicted to drugs, modern legislatures are limited to disarming the same groups. *Rahimi* makes clear, however, that the Second Amendment does not restrict Congress to adopting only regulations that are "identical" to historical laws. 2024 WL 3074728, at *6. And there is no historically-rooted "principle[]" that would allow legislatures to disarm individuals who are actively intoxicated or addicted to illegal drugs, but not those engaged in the regular and ongoing use of the same substances. *Id.*

**ARGUMENT**

**A.** *Rahimi* **Clarifies the Analytical Framework Governing Second Amendment Challenges**

In upholding the federal prohibition challenged in *United States v. Rahimi*, the Supreme Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases."  No. 22-915, 2024 WL 3074728, at *6 (U.S. June 21, 2024).  Those cases "were not meant to suggest a law trapped in amber" because the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791."  *Id.*  As Justice Barrett emphasized in concurrence, "a test that demands overly specific analogues" would involve "serious problems," including "assum[ing] that founding-era legislatures maximally exercised their power to regulate" and "forc[ing] 21st-century regulations to follow late 18th-century policy choices."  *Id.* at *30 (Barrett, J., concurring).

Instead, the Court held that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition."  *Rahimi*, 2024 WL 3074728, at *6 (emphasis added).  Under this analysis, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  *Id.*  Thus, even "when a challenged regulation does not precisely match its historical precursors," it

3

may still "pass constitutional muster" if it "comport[s] with the principles underlying the Second Amendment." *Id.*

*Rahimi* recognized that this test affords legislatures significant leeway to enact firearms regulations. The Court observed that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Rahimi*, 2024 WL 3074728, at *5 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Consistent with that understanding of the right, the Court noted that historical legislatures enacted a "rang[e]" of regulations, including prohibitions on "dangerous and unusual weapons," "rules about firearm storage," and "restrictions on gun use by drunken New Year's Eve revelers." *Id.* The Court further noted that its prior cases have recognized that "many" modern firearms regulations are "'presumptively lawful.'" *Id.* at *10 (quoting *Heller*, 554 U.S. at 626, 627 n.26).

This analytical framework is illustrated by its application to the federal prohibition on firearm possession by individuals subject to domestic violence restraining orders. In sustaining that prohibition, the Supreme Court recognized that the government had "offer[ed] ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi*, 2024 WL 3074728, at *7. That historical evidence included surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and "going armed" laws, which "provided a mechanism

4

for punishing those who had menaced others with firearms." *Id.* at *8-9.  There are a number of differences between these historical laws and the challenged modern prohibition.  For example, "[a]fter providing sureties, a person kept possession of all of his firearms," and "[e]ven if he breached the peace," the penalty "was that he and his sureties had to pay a sum of money," rather than forfeit weapons or face imprisonment.  *Id.* at *41-42 (Thomas, J., dissenting).  Likewise, going armed laws generally applied to "public" misconduct, not to the "conduct [the modern prohibition] seeks to prevent—interpersonal violence in the home." *Id.* at *44 (Thomas, J., dissenting).

The Court recognized that the challenged prohibition "is by no means identical to these founding era regimes," but held that "it does not need to be." *Rahimi*, 2024 WL 3074728, at *9.  Instead, the Court found it sufficient that the prohibition "is 'relevantly similar'" to historical laws "in both why and how it burdens the Second Amendment right." *Id.* (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (2022)).  With respect to the prohibition's rationale, the Court explained that both the modern law and its historical antecedents regulate "individuals found to threaten the physical safety of another." *Id.* at *10.  And with respect to the prohibition's scope, the Court emphasized that "like surety bonds of limited duration," the modern law "only prohibits firearm possession so long as the defendant 'is' subject to a restraining order," and thus involves "temporary" disarmament. *Id.* (quoting 18 U.S.C. § 922(g)(8)).  The Court further emphasized that

as with historical "going armed laws," the modern prohibition's penalties include "imprisonment." *Id.* Based on these similarities, the Court had "no trouble" concluding that the challenged prohibition accords with "[o]ur tradition of firearm regulation." *Id.*

Although *Rahimi* had no occasion to analyze the federal law disarming unlawful drug users, the Court took pains to avoid "suggest[ing] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 2024 WL 3074728, at *9. The Court noted, for example, that its prior cases have identified prohibitions "on the possession of firearms by 'felons and the mentally ill' as "presumptively lawful." *Id.* at *10 (quoting *Heller*, 554 U.S. at 626, 627 n.26).

## B. The Analytical Framework Articulated in *Rahimi* Confirms the Constitutionality of Section 922(g)(3)

The federal restriction at issue here "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 2024 WL 3074728, at *6.

**1.** One principle that emerges from the historical record is that legislatures hold authority to disarm "categories of persons" that "present a special danger of misuse." *Rahimi*, 2024 WL 3074728, at *9. As the government has explained, an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury," 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971); 19th-century sources recognized legislatures'

power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals for centuries. Gov't Br. 12-14, 25-30. In a similar vein, *Rahimi* described surety and going armed laws as reflecting a historical tradition allowing "the Government to disarm individuals who present a credible threat to the physical safety of others." 2024 WL 3074728, at *10. Thus, "legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

That category includes armed drug users. "[D]rugs and guns" are a "dangerous combination." *Rosemond v. United States*, 572 U.S. 65, 75 (2014) (quoting *Muscarello v. United States*, 524 U.S. 125, 132 (1998)). In recognition of that danger, the founders implemented various measures restricting access to firearms by those likely to become intoxicated. *See* Gov't Br. 26-28.[1] For example, *Rahimi* noted that Founding Era legislatures enacted "restrictions on gun use by drunken New Year's Eve revelers." 2024 WL 3074728, at *5. In the nineteenth century, legislatures similarly prohibited the possession of firearms while intoxicated. *See* Gov't Br. 25-26, 25 n.6.[2] And when

---

[1] Relevant historical laws include: Act XII of 1655, 1655 Va. Laws 401, 401-02 (restricting gun use at drinking events); Ch. 1501, 5 Colonial Laws of New York 244-46 (1894) (restricting gun use during the New Year's holiday); An Act for preventing Mischief being done in the town of Newport, or in any other Town in this Government, 1731 R.I. Sess. Laws, pp. 240-41 (restricting gun use in taverns); 1844 R.I. Pub. Laws 503-16, § 1 (excluding "common drunkards" from the militia).

[2] Relevant historical laws include: Kan. Sess. Laws 25, § 282 (1867) ("any person under the influence of intoxicating drink" may not "carr[y] on his person a

*Continued on next page.*

intoxicating substances other than alcohol proliferated around the turn of the twentieth century, legislatures adopted laws disarming those addicted to drugs.  Gov't Br. 29[3]; *see Rahimi*, 2024 WL 3074728, at *22-24 (Kavanaugh, J., concurring) (observing that the Supreme Court has identified "post-ratification history as a proper tool to discern constitutional meaning" and citing dozens of examples).

The limited firearms restriction at issue here "fits comfortably within this tradition." *Rahimi*, 2024 WL 3074728, at *5.  Section 922(g)(3) makes it a crime for a person to possess a firearm if he "is an unlawful user" of "any controlled substance." The term "user" refers to someone who engages in "regular and ongoing use" of a controlled substance "during the same time period as the firearm possession." *United States v. Edmonds*, 348 F.3d 950, 953 (11th Cir. 2003) (per curiam).  Marijuana, the

---

pistol . . . or other deadly weapon"); 1878 Miss. Laws 175-76, § 2 (making it unlawful to sell pistols and certain other weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drink"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329, § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); *see also* 1909 Id. Sess. Laws 6, no. 62, § 1 (making it a crime for "any person" to "have or carry" any "pistol, revolver, gun or any other deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[] . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road).

[3] Relevant historical authorities include: 1931 Pa. Laws 499, no. 158, § 8; 47 Stat. 652, § 7 (1932); 1936 Ala. Laws 52, no. 82, § 8; *In re Rogers*, 66 P.2d 1237, 1238 (Cal. Dist. Ct. App. 1937); 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8.

drug at issue here, is a controlled substance.  *See* 21 U.S.C. § 812(c), sched. I(c)(10).

Simple possession of marijuana is a misdemeanor under federal law, and possession

after a previous conviction for a drug offense is a felony.[4]  *See id.* § 844(a).

Individuals who possess firearms while engaged in the regular use of illegal

drugs endanger public safety in multiple ways.  First, drug users may mishandle

firearms—or use firearms to commit crimes—because of "drug-induced changes in

physiological functions, cognitive ability, and mood."  *Harmelin v. Michigan*, 501 U.S.

957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment).

The effects of marijuana intoxication, for instance, can include an altered "perception

of time," "decreased short-term memory," and "impaired perception and motor

skills."  Nat'l Acads. of Scis., Eng'g, & Med., *The Health Effects of Cannabis and

Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017)

(*Health Effects*).  Second, illegal drug users may "commit crime in order to obtain

money to buy drugs"—and thus pose a danger of using firearms to facilitate such

crime.  *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in

---

[4] The Department of Justice recently issued a notice of proposed rulemaking regarding the scheduling of marijuana.  *See Notice of Proposed Rulemaking: Schedules of Controlled Substances: Rescheduling of Marijuana*, 89 Fed. Reg. 44,597 (May 21, 2024).  The notice proposes to move marijuana from Schedule I to Schedule III but to retain its status as a controlled substance.  *See* 18 U.S.C. § 922(g)(3) (regulating unlawful users of "any controlled substance").  As explained below, *see infra* pp. 13-14, and in our response brief, *see* Gov't Br. 36-45, plaintiffs identify nothing in the Second Amendment's text or history that would require a court to distinguish between the unlawful users of different controlled substances.

9

the judgment). Third, "violent crime may occur as part of the drug business or culture." *Id.* For example, violence may result from "disputes and ripoffs among individuals involved in the illegal drug market." Bureau of Justice Statistics, U.S. Dep't of Justice, *Drug & Crime Data—Fact Sheet: Drug Related Crime* 3 (1994), https://perma.cc/NWH7-PNY4. Fourth, armed drug users endanger themselves. Most gun deaths in the United States result from suicide, not homicide. *See Bruen*, 597 U.S. at 85 (Breyer, J., dissenting). And drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens. *See Health Effects* at 311-12.

Section 922(g)(3) thus bears at least as close a resemblance to historical laws as the modern prohibition that *Rahimi* upheld. Like its traditional counterparts, Section 922(g)(3) is designed to mitigate the "mischief" created when firearms and intoxicating substances coincide. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding a historical precursor to Section 922(g)(3)). The justification for Section 922(g)(3) is particularly strong given that unlike many historical laws, it does not extend to individuals who consume alcohol, a legal substance. Instead, Section 922(g)(3) applies only to individuals whose use of controlled substances involves "regular and ongoing" violations of federal law. *Edmonds*, 348 F.3d at 953. Those law violations support Congressional authority to disarm individuals subject to Section 922(g)(3). *Cf. United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024) (recognizing legislative authority to prohibit the possession of firearms by individuals who are not "law-abiding").

As in *Rahimi*, the restriction at issue here is not "identical" to historical laws, "but it does not need to be." 2024 WL 3074728, at *9. In concluding that the challenged prohibition was "sufficiently similar" to historical precursors, *Rahimi* emphasized, among other things, that the restrictions were of "limited duration," and that violators were subject to "imprisonment." *Id.* at *10. The same similarities are present here. Historical laws disarmed individuals for the duration of their intoxication or drug addiction. Section 922(g)(3) likewise creates a "temporary" firearms disqualification. *Id.* It applies "only so long as [a person] abuses drugs," and permits a user to "regain his right to possess a firearm simply by ending his drug abuse." *United States v. Yancey*, 621 F.3d 681, 686-87 (7th Cir. 2010) (per curiam). In addition, like Section 922(g)(3), many historical laws involved penalties including imprisonment. *See* Gov't Br. 32. History thus "confirm[s] what common sense suggests": regular users of illegal drugs are not entitled to possess deadly weapons in the face of Congress's contrary judgment. *Rahimi*, 2024 WL 3074728, at *9.

**2.** Plaintiffs' argument is premised on the same analytical approach that *Rahimi* rejected.

Plaintiffs do not meaningfully contest legislatures' authority to disarm dangerous categories of persons. Nor do plaintiffs dispute that historical legislatures exercised that authority by disarming individuals who were actively intoxicated. Instead, plaintiffs urge (Opening Br. 22, 43-45) that those who regularly use illegal drugs can only be disarmed if they are "currently intoxicated." Under plaintiffs'

theory, the Second Amendment would strip Congress of power to disarm regular users of all controlled substances, including cocaine, fentanyl, and methamphetamines. *See* 21 U.S.C. § 812, sched. I-II (listing controlled substances). That approach is plainly unworkable and would cast doubt not only on the longstanding provision of federal law at issue here, but also on similar provisions adopted by over 30 States and territories. *See* Petition for a Writ of Certiorari at 11 & n.7, *United States v. Daniels*, No. 23-376, 2023 WL 6623655 (U.S. Oct. 5, 2023) (collecting citations).

*Rahimi* forecloses the argument that modern legislatures may regulate drug users only when they are actively intoxicated. As *Rahimi* emphasized, the Second Amendment "permits more than just those regulations" that are "identical" to their historical counterparts. 2024 WL 3074728, at *6. In arguing otherwise, plaintiffs mistakenly "assume[]" that historical legislatures "maximally exercised their power to regulate." *Id.* at *30 (Barrett, J., concurring). The error in that assumption is especially apparent here, where Section 922(g)(3) responds to a societal problem— firearm possession by unlawful drug users—that was not present at the founding. *See* Gov't Br. 33-34.

There is no plausible historical "principle[]" that would permit legislatures to disarm actively intoxicated individuals but not regular users of intoxicating substances. *Rahimi*, 2024 WL 3074728, at *6. The danger posed by an armed drug user is not limited to the time while they are intoxicated. As explained above, illegal drug users

12

can use firearms to commit crimes that fund their drug habit, to engage in violence as part of the drug business or culture, and to commit suicide. *See supra* p. 9-10. Those risks justify disarming unlawful drug users even between periods of drug intoxication. In any event, Section 922(g)(3) addresses individuals who both regularly use illegal drugs and possess firearms, and who will thus predictably possess firearms while actively intoxicated. Plaintiffs do not claim that they would surrender their guns to others every time they become intoxicated and retrieve them only after regaining sobriety.

Plaintiffs' piecemeal consideration of historical laws is likewise incompatible with *Rahimi*. There, the Supreme Court did not identify a single historical law that was analogous to the challenged federal prohibition in all relevant respects. Instead, the Court recognized that when "[t]aken together," surety and going armed laws embody a historical principle that justifies the challenged prohibition. *Rahimi*, 2024 WL 3074728, at *9. Here, likewise, Section 922(g)(3) is supported not only by laws disarming individuals who were activity intoxicated, but also by laws disarming tavern-goers, New Year's Eve revelers, and others who legislatures judged likely to become intoxicated. *See* Gov't Br. 24, 26-29. In combination, those historical laws confirm modern legislatures' authority to prohibit arms-bearing by those engaged in the regular use of illegal and intoxicating substances.

*Rahimi* also undermines plaintiffs' alternative argument (Opening Br. 34-37, 44-46) that the Second Amendment allows legislatures to disarm regular users of all

13

controlled substances except marijuana. Plaintiffs point to no historical "principle[]" that would require a court to distinguish one illegal, intoxicating substance from another. *Rahimi*, 2024 WL 3074728, at *6. And like *Bruen*, *Rahimi* analyzed whether a modern law was "relevantly similar" to its historical counterparts by considering "why and how it burdens the Second Amendment right." *Id.* at *9 (quoting *Bruen*, 597 U.S. at 29). Plaintiffs have not identified any way in which the particular type of illegal drug at issue alters that analysis. *See* Gov't Br. 36-44.

Plaintiffs derive no support for their position from *Rahimi*'s discussion of "citizens who [a]re not 'responsible.'" 2024 WL 3074728, at *11. In *Heller* and *Bruen*, the Court described the Second Amendment as protecting "responsible" citizens, *see, e.g.*, *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 70, and the government has accordingly used the term "irresponsible" as a shorthand for those individuals whose possession of firearms would endanger themselves or others, *see, e.g.*, Gov't Br. 12-21. In *Rahimi*, the Court noted that while its prior decisions "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those decisions "said nothing about the status of citizens who were not 'responsible'" because the government's authority to disarm those citizens "was simply not presented." 2024 WL 3074728, at *11 (quoting *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 70). The Court made clear, however, that although it declined to adopt the term "irresponsible," it did not "suggest that the Second Amendment prohibits the enactment of laws" disarming "categories of persons thought by a legislature to

present a special danger of misuse." *Id.* at *9. As explained above, historical tradition supports legislative authority to disarm such categories of persons, and plaintiffs have not argued otherwise.

## CONCLUSION

For the reasons given above and in the government's other filings, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

JASON R. COODY
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 *s/ Steven H. Hazel*
STEVEN H. HAZEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7217*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2498*
*Steven.H.Hazel@usdoj.gov*

July 2024

15

## CERTIFICATE OF COMPLIANCE

This brief complies with the page limit established by this Court's February 14, 2024, order because it contains 15 pages, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.


*s/ Steven H. Hazel*
Steven H. Hazel

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system, except for the following, who will be served via mail at the following addresses:

Daniel Russell
Jones Walker, LLP
215 S. Monroe St., Suite 130
Tallahassee, FL 32301

Ryan A. Yeary
Caminez & Yeary, P.A.
1307 S. Jefferson St.
Monticello, FL 32344

*s/ Steven H. Hazel*
Steven H. Hazel