[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-13893

_____

FLORIDA COMMISSIONER OF AGRICULTURE,

Plaintiff,

VERA COOPER,
NICOLE HANSELL,
NEILL FRANKLIN,

Plaintiffs-Appellants,

*versus*

ATTORNEY GENERAL OF THE UNITED STATES,
UNITED STATES OF AMERICA,
DIRECTOR OF BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

Defendants-Appellees.

2                    Opinion of the Court                    22-13893

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00164-AW-MAF

_____

Before BRANCH, LUCK, and TJOFLAT, Circuit Judges.

BRANCH, Circuit Judge:

"[W]hen the Government regulates arms-bearing conduct . . . it bears the burden to justify its regulation." *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quotations omitted). In this case, two Florida medical marijuana users who wish to purchase guns and one gun owner who wishes to participate in Florida's medical marijuana program brought a pre-enforcement action seeking declaratory relief that 18 U.S.C. § 922(d)(3) and (g)(3), which prohibit unlawful drug users from possessing or being sold firearms, are unconstitutional as applied to them. The district court, applying the framework first established in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and built on in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), dismissed the complaint. After assuming that plaintiffs were among "the people" protected by the Second Amendment, the district court conducted *Bruen*'s history-and-tradition test to determine if the challenged statutes were similar to historical gun regulations. The district court concluded that the laws and regulations at issue in this case

were consistent with this Nation's historical tradition of firearms regulation and therefore did not violate the Second Amendment.

After holding oral argument, we held this case in abeyance pending the Supreme Court's decision in *Rahimi* and ordered supplemental briefing on *Rahimi*'s effect on this case. After careful review, we hold that the district court erred in concluding that the plaintiffs did not state a claim for relief. We reach this conclusion because, when viewed in the light most favorable to the plaintiffs, the allegations in the operative complaint do not lead to the inference that the plaintiffs are comparatively similar to either felons or dangerous individuals—the two historical analogues the Federal Government offers in its attempt to meet its burden. We therefore vacate the district court's order and remand for further proceedings consistent with this opinion.

## I.    Background

Vera Cooper, Nicole Hansell, Neill Franklin, (collectively "Appellants") and the Florida Commissioner of Agriculture[1] instituted this action in the Northern District of Florida to challenge the constitutionality of prohibiting medical marijuana users from purchasing and possessing firearms. Specifically, they challenged the constitutionality of 18 U.S.C. § 922(d)(3) and (g)(3)[2]

---

[1] The Florida Commissioner of Agriculture was dismissed on appeal as a party in this matter.

[2] 18 U.S.C. § 922(d)(3) provides:

> It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or

4                    Opinion of the Court                    22-13893

as well as the Bureau of Alcohol, Tobacco, Firearms, and
Explosives's ("ATF") implementation of these statutes through 27
C.F.R. § 478.11 and Form OMB No. 1140-0020 (also known as ATF
Form 4473, hereinafter "Form 4473").  The challenged statutes and
regulations prohibit "unlawful users"[3] of controlled substances

---

> having reasonable cause to believe that such person, including
> as a juvenile . . . is an unlawful user of or addicted to any
> controlled substance (as defined in section 102 of the
> Controlled Substances Act (21 U.S.C. [§] 802))[.]

Section 922(g)(3) provides:

> It shall be unlawful for any person . . . who is an unlawful user
> of or addicted to any controlled substance (as defined in
> section 102 of the Controlled Substances Act (21 U.S.C. [§]
> 802)) . . . to ship or transport in interstate or foreign commerce,
> or possess in or affecting commerce, any firearm or
> ammunition; or to receive any firearm or ammunition which
> has been shipped or transported in interstate or foreign
> commerce.

Section 102 of the Controlled Substances Act defines "controlled
substance" as "a drug or other substance, or immediate precursor, included
in schedule I, II, III, IV, or V of part B of this subchapter" but "does not
include distilled spirits, wine, malt beverages, or tobacco, as those terms
are defined or used in subtitle E of the Internal Revenue Code of 1986." 21
U.S.C. § 802(6).

[3] 27 C.F.R. § 478.11 states that "any person who is a current user of a controlled
substance," including marijuana, is an "[u]nlawful user."  Although § 478.11
does not explicitly define what constitutes a "current user," it does provide
that:

> Such use is not limited to the use of drugs on a particular day,
> or within a matter of days or weeks before, but rather that the
> unlawful use has occurred recently enough to indicate that the

from being sold or possessing firearms. Marijuana is one such controlled substance, and it is currently categorized as a Schedule I drug. 21 C.F.R. § 1308.11(d)(23).[4] A Schedule I drug is one that (1) has a high potential for abuse; (2) has no currently accepted medical use in treatment in the United States; and (3) lacks accepted safety use under medical supervision.[5] 21 U.S.C. § 812(b)(1).

---

> individual is actively engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year.

*Id.*

[4] 21 C.F.R. § 1308.11(d)(23) uses the alternative spelling of "marihuana." Our opinion uses the more common spelling, "marijuana."

[5] The Drug Enforcement Agency recently proposed a rule that would reclassify marijuana as a Schedule III drug. Schedules of Controlled Substances: Rescheduling of Marijuana, 89 Fed. Reg. 44597-01 (proposed May 21, 2024). Federal law classifies Schedule III controlled drugs as drugs that (1) have a potential for abuse less than drugs in schedules I and II; (2) have a currently accepted medical use in treatment in the United States; and (3) abuse of which may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3). Because that proposed regulation is not yet in effect, it plays no role in our analysis. *See infra* note 17.

The operative First Amended Complaint ("FAC") alleged that Franklin is a Florida resident and retired law enforcement officer who is the lawful owner of a firearm.  A physician determined that Franklin was eligible to use marijuana for medical purposes under Florida (not federal) law because he had a qualifying medical condition.  He wants to partake in Florida's medical marijuana program but will not participate "on the sole basis that doing so would subject him to" prosecution under the challenged federal statutes and regulations.

Cooper and Hansell are Florida residents who use medical marijuana in accordance with Florida (not federal) law, and they attempted to purchase firearms.  In so doing, they were required to fill out Form 4473, which contains a question asking would-be purchasers if they are "an unlawful user of, or addicted to, marijuana . . . or any other controlled substance."[6]  Because Cooper and Hansell answered this question in the affirmative, the gun stores denied their purchases.  Cooper and Hansell both wish to purchase a firearm for their personal protection.

Since 2015, Congress has included a budget rider amendment (commonly referred to as the "Rohrabacher-Farr Amendment") in its appropriations bills that precludes the Department of Justice from using any appropriated funds to

---

[6] The FAC explains that Form 4473 also warns that marijuana use "remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where" the prospective firearm purchaser resides.

prevent states from implementing their medical marijuana programs. According to the FAC, Cooper and Hansell "act in reliance upon the Rohrabacher-Farr Amendment" and "only engage in activity they are legally permitted to take and that they know will not expose them to punishment or liability under state or federal law."[7]

Notably, the FAC does not contain any allegations regarding the frequency of Cooper's and Hansell's medicinal marijuana use or the amount of marijuana they consume at any given time. Nor does it contain any allegations related to what marijuana-related side effects, if any, Cooper and Hansell experience. The FAC does not indicate whether they have lost any level of control over their use of marijuana, or whether marijuana impairs regulation of their behavior when they are not using. Indeed, all the FAC alleges regarding their current marijuana use is that they "participate[] in the state medical marijuana program" because of the "benefits [they] obtain[] from such medical use" as well as their reliance on not being criminally prosecuted for their use. In short, nothing in the FAC indicates that Cooper or Hansell have committed any felony or been convicted of any crime (felony or misdemeanor), let

---

[7] Under Florida law, medical marijuana patients must comply with several legal requirements. These include not using marijuana in public, not cultivating marijuana, purchasing marijuana only through approved channels, and presenting patient identification to law enforcement on request. *See* Fla. Stat. § 381.986(12)(c), (d), & (e).

alone that their medical marijuana use makes them dangerous. *But see infra* note 16.

The FAC brought four counts against the Attorney General of the United States and the ATF Director (hereinafter the "Federal Government"). Counts I and II brought claims for declaratory and injunctive relief that the challenged statutes and regulations violate the Second Amendment as applied to Cooper, Hansell, Franklin, and other Florida medical marijuana users.[8] Counts III and IV also brought claims for declaratory and injunctive relief that the prosecution of Cooper, Hansell, Franklin, or any other medical marijuana user would violate the Rohrabacher-Farr Amendment.

The Federal Government moved to dismiss the FAC, arguing *inter alia* that Counts I and II fail as a matter of law because the challenged statutes and regulations are constitutional as applied to all unlawful users of a controlled substance, and because the FAC failed to state a claim with respect to Counts III and IV, the Rohrabacher-Farr Amendment claims.[9]

---

[8] "In an as-applied challenge, a plaintiff seeks to vindicate only her own constitutional rights." *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022). "In evaluating an as-applied challenge, [we] address[] whether a statute is unconstitutional on the facts of a particular case or in its application to a particular party." *Id.* (quotation omitted).

[9] The Federal Government also argued that Hansell and Cooper were the only plaintiffs with Article III standing in this case and that their standing was limited to Counts I and II—the Second Amendment claims—only. Because Counts I and II are the only claims before us on appeal, and because the district court correctly concluded that Hansell and Cooper have Article III standing, we do not elaborate on this issue. *See Babbitt v. United Farm Workers Nat'l*

The district court granted the Federal Government's motion to dismiss. In doing so, it declined to decide whether—based on the Supreme Court's reference in *Heller* to "law-abiding, responsible citizens" enjoying Second Amendment rights, 554 U.S. at 635—medical marijuana users fell outside of the scope of the Second Amendment because they were not "law-abiding" citizens. Instead, assuming that medical marijuana users were "included in 'the people' the Second Amendment protects," the district court proceeded to analyze whether laws precluding medical marijuana users from possessing firearms were consistent with this Nation's historical tradition. Applying analogous reasoning as employed in *Bruen*, the district court determined that prohibiting medical marijuana users from possessing firearms was consistent with the Nation's historical tradition of keeping guns out of the hands of individuals who (1) engage in criminal conduct; and (2) are deemed dangerous, like alcoholics and the mentally ill—the two historical analogues offered by the Federal Government.[10] Accordingly, the district court found that the challenged statutes and regulations as applied to medical marijuana users did not violate the Second

---

*Union*, 442 U.S. 289, 298 (1979) ("When contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights." (alterations adopted) (quotations omitted)).

[10] In discussing the historical analogue of keeping drugs out of the hands of dangerous individuals, the district court equated medical marijuana users with "habitual drug users."

Amendment, and it dismissed Counts I and II of the FAC.[11] Plaintiffs timely appealed.

## II.    Standard of Review

"We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012) (quotations omitted). In this case, that review involves considering the constitutionality of a statute, which we also consider *de novo*. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043 (11th Cir. 2022).

## III.    Discussion

On appeal, Appellants argue that the district court erred by concluding that they had not stated a claim that the challenged statutes and regulations violate their Second Amendment rights. Appellants assert that the district court should not have accepted the Federal Government's offered analogues because nothing in the FAC indicates they are engaging in felonious conduct and they cannot fairly be labeled as dangerous individuals based solely on their general use of marijuana for medicinal purposes. Accordingly, they argue that the Federal Government has not met its "burden of showing that disarming state-law compliant medical

---

[11] The district court also dismissed Counts III and IV for failing to state a claim, but as discussed in note 9, plaintiffs do not appeal the dismissal of these counts.

marijuana users comports with the history and tradition of the Second Amendment" at the motion to dismiss stage.

Upon review, we find that the district court erred in granting the Federal Government's motion to dismiss because it did not view the FAC's allegations in the light most favorable to Appellants. When viewed in this light, Appellants cannot be fairly compared with felons or those the government deems dangerous. Thus, the government failed to meet its burden—at the motion to dismiss stage—to establish that disarming medical marijuana users is consistent with this Nation's history and tradition of firearm regulation.

A.  *Second Amendment Framework*

We begin our analysis by laying out the applicable legal framework for assessing Second Amendment challenges.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In a groundbreaking decision striking down a D.C. law that prohibited private possession of handguns, the Supreme Court in *Heller* noted that there is "a strong presumption that the Second Amendment right . . . belongs to all Americans." 554 U.S. at 581. The Court held "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595. But *Heller* left many questions unanswered. Indeed, *Heller* recognized that it did not "clarify the entire field" while nevertheless guaranteeing the right for "law-

abiding, responsible citizens." *Id.* at 635. *Heller* emphasized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. And as relevant to our instant case, *Heller* noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.*

Following *Heller*, the courts of appeals coalesced around a two-step test for Second Amendment challenges. *Bruen*, 597 U.S. at 18. First, courts determined whether the law at issue regulated activity within the scope of the Second Amendment's original historical meaning. Second, if it did, courts applied means-end scrutiny to test the law's validity at the second step. *Id.* at 19.

Later, in *Bruen*, the Supreme Court scrapped the means-end scrutiny test and explained that, under *Heller*, a historical inquiry governs Second Amendment challenges. *Id.* Accordingly, the Supreme Court adopted a different two-part test from that which the circuits were applying. First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. That "textual analysis focuse[s] on the normal and ordinary meaning of the Second Amendment's language." *Id.* at 20 (quotations omitted). And the normal and ordinary meaning of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" because "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive

action in a case of conflict with another person.'" *Id.* at 32 (ellipses in original) (quoting *Heller*, 554 U.S. at 584). If an individual's conduct is covered by the Second Amendment, then "the Constitution presumptively protects that conduct." *Id.* at 24.

At the second step, the Government is required to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id. Bruen* explained that in some cases this historical inquiry "will be fairly straightforward." *Id.* at 26. For example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that [the] modern regulation is unconstitutional." *Id.* at 26–27. But when courts are confronted with laws and regulations that implicate "unprecedented societal concerns or dramatic technological changes," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 27–28. This analogical reasoning "requires a determination of whether the two regulations are relevantly similar." *Id.* at 29 (quotations omitted).

In determining whether two regulations are relevantly similar, *Bruen* held that courts should assess "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-

defense." *Id.* (emphasis added). "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotations and emphasis omitted). However, this reasoning "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. Courts must be careful to not "uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* (alteration adopted) (quotations omitted). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (italics in original). Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster. *Id.*

Most recently in *Rahimi*, the Supreme Court reaffirmed the test it adopted in *Bruen* but provided some clarification that while the government "bears the burden to justify its regulation," some courts have "misunderstood the methodology of [its] recent Second Amendment cases." 602 U.S. at 691 (quotation omitted). *Rahimi* emphasized that *Bruen* and its predecessors "were not meant to suggest a [regulatory] law trapped in amber" and that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691–92. Accordingly, the Court reemphasized that "[w]hy and *how* the regulation burdens the [Second Amendment] right are central to [a court's] inquiry." *Id.* at 692 (emphasis added).

With the above framework in mind, we now apply the steps required by *Bruen* (as clarified by *Rahimi*) to the instant case.

### B.  *Application of the Framework*

#### 1.  *Step One of the Bruen Framework*

*Bruen*'s first step requires us to determine whether "the Second Amendment's plain text covers [Cooper's and Hansell's] conduct."[12] *Bruen*, 597 U.S. at 17.  The Supreme Court has said this text "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  *Id.* at 32 (quoting *Heller*, 554 U.S. at 592).  Accordingly, we determine that Cooper's and Hansell's conduct of attempting to purchase and possess firearms for self-defense purposes is clearly covered by the Second Amendment's plain text.

The Federal Government does not argue that Cooper's and Hansell's *conduct* is not covered by the plain text of the Second

---

[12] We note that according to the FAC, Cooper and Hansell are the only Appellants who are currently unlawful users of marijuana, whereas Franklin is a gun owner who wants to participate in Florida's medical marijuana program.  Because the Federal Government's offered historical analogues focus on "unlawful drug use" and the effects such use has on a user's criminal status and mental state, our discussion likewise focuses on Cooper's and Hansell's alleged conduct.

Similarly, throughout this opinion, our discussion focuses on the constitutionality of 18 U.S.C. § 922(g)(3), which prohibits unlawful users of controlled substances from possessing firearms.  But our analysis applies with equal force to 18 U.S.C. § 922(d)(3), which prohibits sales of firearms to unlawful users of controlled substances, and all implementing regulations for both statutes, which disarm plaintiffs because of their marijuana use.

Amendment.  Instead, it appears to argue that Cooper and Hansell are not among "the people" protected by the Second Amendment because their use of medical marijuana violates federal law.  This illegal use of marijuana, the Federal Government asserts, makes Cooper and Hansell akin to felons because through their use they have shown they are not "law-abiding, responsible citizens," and felons have historically been excluded from the right to bear arms.  *See United States v. Dubois*, 139 F.4th 887, 890–94 (11th Cir. 2025) (reaffirming the constitutionality of 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing firearms).

The district court declined to decide whether Cooper's and Hansell's use of medical marijuana excluded them from "the people" who fall within the Second Amendment's protection.  Instead, the district court assumed that "the people" includes Cooper and Hansell.    We, however, reject the Federal Government's argument for two reasons.  First, while there is a history and tradition in this Nation of disarming convicted felons, nothing in the FAC indicates that Cooper and Hansell have ever been convicted of any crime, let alone a felony.  Nor are there any allegations that they are engaging in felonious conduct.  The only crime that the FAC plausibly alleges Cooper and Hansell have committed at this stage is simple possession of a controlled substance, which is a misdemeanor.[13]  The parties do not cite, and

---

[13] The Controlled Substances Act provides that a first-time offender convicted of possession of a controlled substance "may be sentenced to a term of imprisonment of not more than 1 year."  21 U.S.C. § 844(a).  And federal law defines "felony" as "an offense punishable by a maximum term of

we are not aware of, any authority for the proposition that misdemeanants are not among the people who enjoy the right to bear arms as protected by the Second Amendment. We decline to hold so now.[14]

Second, following *Rahimi*, we reject the Federal Government's argument that Cooper and Hansell are not among "the people" because they are not "law-abiding" or "responsible." In *Rahimi*, the Supreme Court explicitly "reject[ed] the Government's contention that Rahimi may be disarmed simply because he [was] not 'responsible.'" *Rahimi*, 602 U.S. at 701. In doing so, the Court explained that "'[r]esponsible' is a vague term" and that it was "unclear what such a rule would entail." *Id. Rahimi*

---

imprisonment of more than one year." 18 U.S.C. § 3156(a)(3). Moreover, under Florida law, a person who possesses marijuana according to the state's medical marijuana laws cannot be criminally prosecuted under Florida's other controlled substances laws. *See* Fla. Stat. § 381.986(14). Accordingly, based on the allegations in the FAC, Cooper and Hansell are at most committing a federal misdemeanor when they possess marijuana.

[14] Indeed, in *Kanter v. Barr*, then-Judge Barrett observed that when considering constitutional rights, courts typically do not consider whether some individuals categorically fall inside or outside the scope of a particular right. *See Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J., dissenting). Instead, "the deprivation [of a right] occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id.* at 452–53. A "state can disarm certain people . . . but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes *eligible* to lose it." *Id.* at 453.

clarified that *Heller*'s and *Bruen*'s use of the term "responsible" was simply "to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right" and "said nothing about the status of citizens who were not 'responsible.'"  *Id*. at 701–02; *see also id*. at 772–73 (Thomas, J., dissenting) (noting that "[n]ot a single Member of the Court adopt[ed] the Government's theory" that Congress could "disarm anyone who is not 'responsible' and 'law-abiding'").  Accordingly, at the first step of the *Bruen* framework, we conclude that the Second Amendment's plain text covers Cooper and Hansell and their conduct.  *See Bruen*, 597 U.S. at 17.

    *2.  Step Two of the Bruen Framework*

We next turn to the second step of the *Bruen* framework, determining whether the Federal Government has "justif[ied] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24. The district court determined that the Federal Government had met its burden because disarming unlawful users of a controlled substance, including medical marijuana users, was analogous to regulations disarming: (1) "those engaged in criminal activity"; and (2) "those whose status or behavior would make it dangerous for them to possess firearms" like the mentally ill, drug addicts, alcoholics, and the intoxicated.

Appellants argue the district court's determination was in error because, based on the allegations in the FAC, they cannot be considered relevantly similar to either felons who have historically been disarmed or people who present a special danger.   The

Federal Government argues that the district court correctly determined it had met its burden because in its view, all unlawful drug users—regardless of the substance they use or the manner in which they use it—are comparable to those who (1) engage in criminal conduct; and (2) are dangerous as a class. Upon review, we agree with Appellants.

We begin our step two inquiry by examining the Federal Government's first offered historical analogue, the Nation's history and tradition of disarming "those engaged in criminal conduct." Rehashing its argument from step one, the Federal Government asserts that Cooper and Hansell have failed to refute the analogy between laws disarming convicted felons and the challenged statutes and regulations that disarm unlawful drug users. This historical analogue, however, does not share the same "how"— that is, the "burden on the right of armed self-defense"—as 18 U.S.C. § 922(g)(3) applied to Cooper and Hansell, for two reasons. *Bruen*, 597 U.S. at 29.

First, as discussed above, at most the FAC alleges that Cooper and Hansell are committing a misdemeanor, not a felony, by using marijuana for medicinal purposes. The Federal Government has not pointed to any historical tradition of disarming those engaged in misdemeanant conduct. Because 18 U.S.C. § 922(g)(3) applied to Cooper and Hansell disarms people who are not felons, the statute "regulates arms-bearing . . . to an extent beyond what was done at the founding," which demonstrates that 18 U.S.C. § 922(g)(3) is "not . . . compatible with

the [Second Amendment] right" in this case.  *Rahimi*, 602 U.S. at 692.

Second, felon dispossession laws require an individual to be convicted of a felony before they lose their Second Amendment right.  But the FAC does not allege Cooper or Hansell have been convicted of any crime, felony or misdemeanor.  The manner in which felon dispossession laws operate to strip individuals of their Second Amendment right—following a judicial determination as to their guilt in committing a felony—is starkly different from how the challenged statutes and regulations apply to Cooper and Hansell, two individuals who have never faced a judicial determination of guilt for any crime.  Put another way, because Cooper and Hansell have never faced a judicial determination of guilt for any crime, they would not have been disarmed under the government's first offered historical analogue—but they are disarmed by 18 U.S.C. § 922(g)(3).  Thus, 18 U.S.C. § 922(g)(3), as applied to Cooper and Hansell, imposes a greater "burden on the right of armed self-defense" than the Federal Government's first historical analogue, not one that is "comparable."  *Bruen*, 597 U.S. at 29.

Accordingly, we determine that based on the allegations in the FAC, Cooper and Hansell are not relevantly similar to felons who have historically been disarmed.  *See id.*; *Rahimi*, 602 U.S. at 692.  Thus, we reject the Federal Government's first offered analogue at the motion to dismiss stage.

The Federal Government's second analogue is that the Nation has a long history and tradition of disarming individuals it fairly deems as dangerous, including the mentally ill, drug addicts, alcoholics, and the intoxicated. It argues that *Rahimi* makes clear that Congress may disarm those who pose a real danger to the public and that, as unlawful users of a controlled substance, medical marijuana users fit firmly within this category of dangerous individuals because they may mishandle firearms, commit crimes to obtain drugs, or even engage in violent crime as part of the illegal drug trade. Accordingly, it asserts that the challenged laws and regulations "bear[] at least as close a resemblance to the historical laws as the modern prohibition that *Rahimi* upheld" and that we should therefore uphold the district court's determination that these laws are constitutional as applied to all medical marijuana users. But the Federal Government has again failed to meet its burden at this point in the litigation to show that its "dangerousness" analogue imposes a comparable burden on the Second Amendment right—the same "how"—as 18 U.S.C. § 922(g)(3) applied to Cooper and Hansell: based on the allegations in the FAC, Cooper and Hansell cannot fairly be labeled as dangerous people solely due to their medicinal marijuana use. *See Rahimi*, 602 U.S. at 692 ("Why and *how* the regulation burdens the [Second Amendment] right are central to this inquiry." (emphasis added)).

As discussed above, the FAC contains no allegations regarding either the frequency of use or effects that consumption of marijuana has on Cooper and Hansell—or other medical

marijuana users. The FAC's only allegation about the nature of Cooper's and Hansell's use is that they use marijuana only as permitted by Florida law. And while the district court labeled them as "habitual drug users," presumably akin to addicts, the FAC says no such thing, stating simply that Cooper and Hansell use marijuana for the medical benefits they receive and in reliance on the fact that they will not be criminally prosecuted for their medicinal use. Viewing these allegations in the light most favorable to Cooper and Hansell, it appears they use rational thought in making their decision to use marijuana and would stop their marijuana use if they were placed at risk of criminal prosecution. Accordingly, Cooper's and Hansell's mental state is a far cry from that of addicts and alcoholics whose actions are controlled by their need to use alcohol or drugs. *See United States v. Yancey*, 621 F.3d 681, 682, 685 (7th Cir. 2010) (affirming the constitutionality of 18 U.S.C. § 922(g)(3) as applied to a criminal defendant who "had been smoking marijuana daily" for two years, reasoning that "habitual drug users" like the defendant were "more likely to have difficulty exercising self-control").

Similarly, the Federal Government's argument that medical marijuana users pose a risk of committing violent crimes to obtain marijuana finds no support in the FAC. True, federal law prohibits using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c). And "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. But this tradition "distinguishes

citizens who have been found to pose a credible threat . . . from those who have not." *Id.* Nothing in the FAC indicates that Cooper and Hansell are engaged in any drug market aside from the Florida medical marijuana market, which is highly regulated and requires dispensaries to comply with State law as enforced by the Florida Department of Agriculture and Consumer Services. *See* Fla. Stat. § 381.986. Nor is there any indication in the FAC that Cooper and Hansell "pose a credible threat" to the public safety of others based solely on their use of medical marijuana. *See Rahimi*, 602 U.S. at 700.

Accordingly, we determine that the factual allegations, construed in the light most favorable to Cooper and Hansell, do not lead to an inference that they, because they are medical-marijuana users, can fairly be labeled as dangerous. Our determination means that Cooper and Hansell would not be disarmed under the Federal Government's second offered historical analogue, but they are disarmed by 18 U.S.C. § 922(g)(3). Thus, because 18 U.S.C. § 922(g)(3), as applied to Cooper and Hansell, imposes a greater burden on the Second Amendment right than the Federal Government's second offered analogue, we reject the analogue at the motion to dismiss stage. *See Bruen*, 597 U.S. at 29 ("[W]hether modern and historical regulations *impose a comparable burden on the right of armed self-defense* and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." (first emphasis added, second emphasis in original) (quotation omitted)).

Because both of the Federal Government's historical analogues fail at the motion to dismiss stage, we conclude it has failed to meet its burden of establishing that the challenged laws and regulations as applied to medical marijuana users are consistent with this Nation's history and tradition of firearm regulation. Thus, the Appellants have plausibly alleged that the challenged statutes and regulations violate the Second Amendment as applied to them.[15]

Our conclusion comports with sister circuit precedent. *See United States v. Connelly*, 117 F.4th 269, 272 (5th Cir. 2024). In *Connelly*, the Fifth Circuit considered whether 18 U.S.C. § 922(g)(3) was constitutional as applied to a "non-violent, marijuana smoking gunowner." *Id.* The Fifth Circuit held that the defendant's "§ 922(g)(3) charge is inconsistent with our history and tradition of firearms regulations." *Id.* at 283. In so holding, the Fifth Circuit held that the defendant "is a member of our political community and thus has a presumptive right to bear arms." *Id.* at 274. The Fifth Circuit then rejected the Federal Government's analogies between 18 U.S.C. § 922(g)(3) as applied to the defendant and laws

---

[15] Recall that Appellants are bringing an as-applied challenge to the constitutionality of the challenged statutes and regulations. And "because a factual, as-applied challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider." *Schultz v. Alabama*, 42 F.4th 1298, 1319 (11th Cir. 2022) (quotations omitted). "This is because an as-applied challenge addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party." *Id.* (quotations omitted).

that disarmed mentally ill, dangerous, or intoxicated individuals. *Id.* at 274–82. So do we. Accordingly, we join the Fifth Circuit and vacate and remand this case. *See also United States v. VanOchten*, ___ F.4th ___, 2025 WL 2268042, at *6–8 (6th Cir. Aug. 8, 2025) (holding that 18 U.S.C. § 922(g)(3) can be constitutionally applied to "dangerous individuals" and leaving open the opportunity for "drug users" to "prove that they are not actually dangerous" in future cases); *United States v. Harris*, 144 F.4th 154, 164–65 (3d Cir. 2025) (holding that 18 U.S.C. § 922(g)(3) "constitutionally restricts the gun rights of drug users *only as long as they present a special danger of misusing firearms*" and remanding for more fact-finding (emphasis added) (quotation omitted)); *United States v. Cooper*, 127 F.4th 1092, 1096 (8th Cir. 2025) (holding that a prosecution under 18 U.S.C. § 922(g)(3) violates the defendant's Second Amendment rights unless the defendant "act[ed] like someone who is both mentally ill and dangerous," "induce[d] terror," or "pose[d] a credible threat to the physical safety of others with a firearm" and remanding for further fact-finding (quotations omitted)).

## IV.    Conclusion

Based on Appellants' factual allegations, Appellants cannot be considered relevantly similar to either felons or dangerous individuals based solely on their medical marijuana use. Accordingly, the Federal Government has failed, at the motion to dismiss stage, to establish that disarming Appellants is consistent

with this Nation's history and tradition of firearm regulation.[16] Thus, we vacate the district court's order and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**[17]

---

[16] The Federal Government very well may prove at a later stage of litigation, after development of a factual record, that Appellants can fairly be considered relevantly similar to felons or dangerous individuals who can categorically be disarmed. Indeed, as Appellants concede on appeal (but, as discussed, not in the FAC), they may be fairly deemed as dangerous during the times they are high and thus have limitations placed on their right to use firearms while in such a mental state. *See Rahimi*, 602 U.S. at 691 ("At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers."). But at the current stage of litigation, it cannot be determined whether they use marijuana to such an extent that it has a continuous effect on their psychological and physical well-being.

[17] If the Drug Enforcement Agency's proposed rule reclassifying marijuana as a Schedule III controlled substance is finalized, *see supra* note 5, the district court should determine what effect that final rule has on its Article III jurisdiction.